AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
05/27/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: AH DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
05/27/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: IV DEPUTY

United States of America

v.

MICHAEL ANGEL ALVAREZ,
aka "Diablo,"

Defendant

Case No. 2:26-mj-03156-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of May 18, 2026, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 931(a) | Possession of body armor by violent felon |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Ashley Anderson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 05/27/2026

*Judge's signature*

City and state: Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jena A. MacCabe (x5046)

# AFFIDAVIT

I, Special Agent Ashley Anderson, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2024. I am assigned to the Los Angeles Metropolitan Task Force on Violent Gangs and the Homeland Security Task Force (HSTF), a multi-agency task force led by the FBI, Drug Enforcement Agency, and Homeland Security Investigations, which includes the Los Angeles Police Department ("LAPD") and the Los Angeles County Sheriff's Department.

2. During my law enforcement career, I have been tasked with investigating gang-related crimes, including, but not limited to the following: murders, attempted murders, extortions, robberies, narcotics and firearm sales/trafficking, burglaries, batteries, assaults with deadly weapons, identity thefts, auto thefts and burglaries, and occurrences of domestic violence. I have become familiar with the political hierarchy and operations of gangs.

3. In addition, I have participated in numerous search warrants, controlled purchases of drugs and firearms, surveillance operations, the interception of wire communications, and the arrests of drug users, narcotics traffickers, and members and associates of criminal street gangs. I have also been introduced and been a handler to confidential informants and sources that possessed extensive

knowledge of the inner workings of criminal street gangs. I also consult regularly with other narcotic and gang experts regarding the methods and practices of street gang members participating in, but not limited to, violent crimes, extortion, and drug and firearm sales/trafficking.

4. As of 2026, I have assisted with investigations related to 18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt Organizations Act conspiracy) and have successfully arrested several members of criminal street gangs on this charge.

## II. PURPOSE OF AFFIDAVIT

5. This affidavit is made in support of a criminal complaint against, and arrest warrant for, MICHAEL ANGEL ALVAREZ, also known as "Diablo," ("ALVAREZ") for a violation of 18 U.S.C. § 931(a) (possession of body armor by violent felon). This affidavit is also made in support of a search warrant for a black Apple iPhone and a blue Samsung cellphone, both of which were seized from ALVAREZ on May 18, 2026, and are currently in LAPD's custody (the "SUBJECT DEVICES") described in Attachment A, for the items to be seized described in Attachment B.

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described

in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## III. PROPERTY TO BE SEARCHED

7. The property to be searched is the SUBJECT DEVICES described in Attachment A, which is incorporated herein by reference.

## IV. ITEMS TO BE SEIZED

8. The items to be seized are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 931(a) (possession of body armor by violent felon) and 18 U.S.C. § 1962(d) (Racketeer Influenced and Corrupt Organizations Act conspiracy) (the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

## V. SUMMARY OF PROBABLE CAUSE

9. Since ALVAREZ's recent release from a 50-year-to-life sentence for murder, which the jury found he committed to further the activities of his criminal street gang, namely, 18th Street, ALVAREZ has remained an active 18th Street gang leader, while on the City of Los Angeles's payroll purportedly as a "Peace Ambassador" in 18th Street's MacArthur Park territory.

10. Despite being a violent felon, not to mention serving a probationary sentence and reportedly on the clock as a Peace Ambassador, ALVAREZ was arrested near MacArthur Park on May 18, 2026, in possession of the SUBJECT DEVICES and two body armor plates from Las Vegas, Nevada, that are marketed as "the highest protection level available on the civilian market."

## VI. STATEMENT OF PROBABLE CAUSE

### A. ALVAREZ Holds Himself Out as a "Peace Ambassador" for the City of Los Angeles in MacArthur Park, Despite Actively Participating in the 18th Street Gang's Activities and Committing Crimes in and Around the Park

11. Based on information relayed to me by Task Force Officer ("TFO") Art Castro about jail calls and body worn camera footage that he has reviewed, I know the following:

a. As captured on body camera footage, on May 24, 2025, LAPD Patrol Officer Ismael Alvarez was in the vicinity of Alvarado Street and Maryland Avenue -- an area that I know, based on my training and experience, is controlled by and used for drug trafficking by 18th Street gang members -- when he conducted a consensual encounter with ALVAREZ, who is a known member of the 18th Street gang. ALVAREZ explained that he was recently released from California State custody for a homicide he committed as a juvenile. ALVAREZ and Officer Alvarez discussed ALVAREZ's gang membership and activities around MacArthur Park. Officer Alvarez provided ALVAREZ with his business card containing his Los Angeles City cellphone number in the event he needed resources, and ALVAREZ provided his business card containing his phone number of 213-824-6982. ALVAREZ's business card read "CD1" (i.e., Los Angeles City

Council District 1), "Peace Ambassador" (which is discussed further below). A photo of that business card is below:




b. TFO Castro ran ALVAREZ's cellphone number in the Los Angeles County Sheriff's Department inmate telephone monitoring system and found calls with ALVAREZ'S number. The following are summaries of calls that TFO Castro reviewed:

i. On January 3, 2026, inmate Jose Rodriguez, also known as "Danger," ("Rodriguez") from the 18th Street gang called 213-824-6982, which, as discussed above, is the phone number from ALVAREZ's business card. During the recorded jail call, ALVAREZ told Rodriguez about two females who were shot. ALVAREZ told Rodriguez the female who was killed would drive the "homies" around the neighborhood. ALVAREZ told Rodriguez the intended target was "Trips"[1] but he ran away. ALVAREZ told

[1] Based on my training, experience, conversations with other law enforcement officers, and investigation of the 18th Street gang, I believe "Trips" is a reference to Marvin Martinez, who is from the 18th Street gang and uses that moniker.

Rodriguez that ALVAREZ "super marked out bitch ass Trips"[2] and told Rodriguez he should have been there.

ii. On February 5, 2026, inmate Steven Paz, also known as "Studders," ("Paz") from the 18th Street gang called 310-800-7323, which investigators identified as Rodriguez's cellphone. During the recorded jail call, Rodriguez told Paz there was a big hood meeting and "Trips" (hereinafter, "Martinez") and "Dopey"[3] were no longer "from the hood." Rodriguez told Paz they were both "smashed out"[4] of the hood. Rodriguez told Paz that "Dopey" was "smashed out" of the hood for going to court and testifying against "Rival."[5] Rodriguez told Paz that Martinez was a "marked out" gacho.[6] Paz asked, "Why Trips?" Rodriguez told Paz the "homie" that "has the hood"[7]

---

[2] Based on my training, experience, conversations with other law enforcement officers, and investigation of the 18th Street gang, I know that "marked out" is a gang term that means to label someone as a target for violence due to breaking rules or for disloyalty to the gang.

[3] Based on my training, experience, conversations with other law enforcement officers, and investigation of the 18th Street gang, I believe "Dopey" is a reference to Martinez's sister.

[4] Based on my training, experience, conversations with other law enforcement officers, and investigation of the 18th Street gang, I know that "smashed out" means an assault on an individual.

[5] Based on my training, experience, conversations with other law enforcement officers, and investigation of the 18th Street gang, I believe that "Rival" is a reference to an 18th Street gang member.

[6] Based on my training, experience, conversations with other law enforcement officers, and investigation of the 18th Street gang, I know that "gacho" is Spanish slang for "ugly" or "bad."

[7] Based on my training, experience, conversations with other law enforcement officers, and investigation of the 18th Street gang, I know that the "homie" that "has the hood" is the one in charge of the 18th Street gang.

said it was for the "homegirl that got smoked." Later in the call, Rodriguez told Paz the "homie" that "has the hood" is ALVAREZ.

c. As captured on body camera footage, on March 3, 2026, Officer Alvarez was in the vicinity of Parkview Street and Wilshire Boulevard when he initiated a consensual encounter with ALVAREZ. ALVAREZ told Officer Alvarez that "we" cleaned house and Martinez was not "from the hood" anymore.[8] ALVAREZ said that Martinez was the one who led to all the "stupid shit" going on including the girl that was killed. ALVAREZ said it was Martinez's fault she was killed. ALVAREZ said that a "lot of fools" have "gotten fucked up bad for character and they are gone and not welcome anymore." According to ALVAREZ, Martinez needed to protect himself. ALVAREZ said Martinez was "stomped out." ALVAREZ also said that Martinez was no longer in the area, and his sister "Dopey" was not welcome. ALVAREZ explained that even Martinez's mother "had to go." Officer Alvarez asked ALVAREZ who beat up Martinez. ALVAREZ told Officer Alvarez that he was asking too many questions.

12. According to records from the State of California's Employment Development Department that I have reviewed, Healing Urban Barrios paid ALVAREZ throughout each quarter of 2025 for a total of $58,156 for the year. In ALVAREZ's post-arrest interview on May 18, 2026, which I participated in, as discussed

[8] Based on my training, experience, conversations with other law enforcement officers, and investigation of the 18th Street gang, I believe that ALVAREZ meant that Martinez was no longer from the 18th Street gang.

below, ALVAREZ stated that he still worked for Healing Urban Barrios.

13. According to Council District 1's website (https://cd1.lacity.gov/Peace-Ambassadors), "[s]ince January 2025, two full-time Peace Ambassador teams have been deployed to high-need areas in Pico Union and Westlake, including MacArthur Park. Each team consists of two unarmed workers who have lived experience in the justice or gang systems and are trained in violence prevention and trauma-informed care." According to that website, Healing Urban Barrios and Homies Unidos were the organizations contracted for the Peace Ambassador teams. Based on my conversations with other law enforcement officers, I know that ALVAREZ has represented himself as one of the Peace Ambassadors through clothing he wears.

14. According to an official website of the City of Los Angeles (https://cityclerk.lacity.org/onlinecontracts/2024/C-146408_c_10-10-24.pdf), Healing Urban Barrios entered into an agreement with the City of Los Angeles to appropriate $450,000 from the General City Purpose Fund between June 1, 2024, and May 31, 2027. According to that website, the agreement's purpose was "[t]o defray operation costs of expenditures incurred with the unique services provided by Healing Urban Barrios for their services provided as Peace Ambassadors." Specifically, the agreement's services are to "be provided to the Olympic and

Rampart GRYD zones"[9] to engage people in those zones "to participate in pro-social activities" and "to assist families, victims and community members with emotional support and comfort through in person violence prevention/interruption, counseling and/or vigils." Also according to the agreement, the City may immediately terminate the contract if a Peace Ambassador is convicted of an "Act of Moral Turpitude," including "crimes involving weapons."

15. Despite the terms of the Peace Ambassadorship agreement, according to his criminal history records, on April 2, 2025, ALVAREZ was convicted of a felony, namely, being a prisoner in possession of a weapon in violation of California Penal Code § 4502(a). He was sentenced to two years' probation and one day's jail for that felony. He had search conditions as part of his probation. Even as recently as September 12, 2025, as part of a hearing on a possible probation violation -- at which a bench warrant was issued for ALVAREZ -- the Los Angeles County Superior Court noted those conditions, which include: "Submit your person and property to search and seizure at any time of the day or night, by any probation officer or other peace officer, with or without a warrant, probable cause, or reasonable suspicion." With ALVAREZ present on October 13,

---

[9] As explained in Mayor Karen Bass's announcement of "DROP IN VIOLENT CRIME IN MACARTHUR PARK AREA SINCE CITY ACTION IN JANUARY" 2025, which was posted on the City of Los Angeles's official website on March 10, 2025 (https://mayor.lacity.gov/news/mayor-bass-announces-drop-violent-crime-macarthur-park-area-city-action-january), GRYD (i.e., Gang Reduction Youth Development) "implements de-escalation strategies and works to prevent retaliatory shootings."

2025, the court reinstated probation on those same terms and conditions.

16. Based on my review of an LAPD report, as well as my conversations with other officers, I know that ALVAREZ was also arrested on November 10, 2025, for possession of slot machines in violation of California Penal Code § 330.1. To my knowledge, charges were not filed. However, according to the report, that day, officers saw ALVAREZ "working in concert with other suspects to transport various gambling machines from the illegal casino into the box truck."

**B. ALVAREZ Was Arrested on May 18, 2026, in Possession of Body Armor, Despite Being a Violent Felon**

17. Based on my review of LAPD reports, conversations with other officers, and review of LAPD camera footage, I know that on May 18, 2026, two uniformed officers responded to a call for backup related to a stolen vehicle investigation near MacArthur Park. As they were leaving, they saw an individual -- later identified as ALVAREZ -- standing on the corner looking at the officers. One of the officers on the scene said that he had detained that individual recently and believed he might be a wanted person. When the officers entered their police car, ALVAREZ walked into a grocery store parking lot and entered his car. Officers directed ALVAREZ to exit his car, which he did, and asked him if he was on parole or probation, to which he admitted. Officers were able to confirm ALVAREZ's active probation but did not find any warrants for his arrest. Pursuant to his probation search conditions, officers searched

ALVAREZ’s car and found two body armor plates in the trunk. The officers also seized the SUBJECT DEVICES.

18. According to LAPD footage that I reviewed, ALVAREZ claimed to be “CRT,” which I believe, based on my training and experience, was a reference to the Los Angeles Mayor’s Crisis Response Team. While he was seated in the back of the police car, ALVAREZ asked if he could let his supervisor know what was going on because he was “working right now.” He also said that he served 24 years on his murder sentence, discussed below, and was released two years ago. Further, he said that he was still from the 18th Street gang. When asked why he had body armor, he said he was going to “draw on it” because he liked “doing graffiti and stuff like that.”

19. Following ALVAREZ’S arrest, he was transported to LAPD Rampart Division for booking and processing. There, I, along with TFOs Arturo Castro and Hugo Ayon, interviewed ALVAREZ. Below is a summary of the interview:

a. At approximately 11:46 a.m., TFO Ayon read ALVAREZ his Miranda rights, which ALVAREZ waived and agreed to speak with all law enforcement present.

b. ALVAREZ is currently working for “Healing Urban Barrios” and has spoken with a city council member to whom he has actively mentioned his ties to 18th Street. ALVAREZ self-identified as a member of the 18th Street gang to me and TFOs Ayon and Castro.

c. Recently, ALVAREZ was stabbed while working in his Peace Ambassador capacity. ALVAREZ attempted to alert the

City of Los Angeles in hopes of claiming some sort of financial aid for his injuries; however, he was told no due to the programs not wanting to alert the Los Angeles City Council members of the incident due to their advocation for these programs.

d. ALVAREZ stated that after he got out of prison, he came out with “juice”[10] due to the amount of time he served and the severity of his conviction. Although he did not want to be “the guy,” he found the 18th Street gang was in disarray with a lack of command structure and was bestowed the power by other members to fix it.

e. ALVAREZ obtained the body armor plates from an alley near MacArthur Park and planned to draw/paint on them and then display them for the youth.

20. Each piece of body armor that ALVAREZ possessed has a sticker on the back that reads IRON ARMADILLO® Level IV/RF3 Rifle Plate. The sticker for each listed a manufacturing date of December 2025. According to the website for this product (https://www.ironarmadillo.com/products/ia-hp-rf3), “[t]his ballistic plate” is “the highest protection level available on the civilian market.” It is listed as a “Shooters Cut.” As of the date of this affidavit, the body armor was listed on sale for $159 from the original price of $199. The company selling

[10] Based on my training and experience, along with conversations from gang and narcotics experts, I know that the term “juice” often refers to a level of deep respect. “Juice” is earned through, typically violent, acts conducted in furtherance of the gang’s priorities. I also know that someone who has “juice” within the gang has power to control and direct gang-related activities.

this body armor is located in Las Vegas, Nevada, according to its website and the sticker on the back of the body armor. A photo of that sticker is below:




21. According to a certified conviction record that I reviewed, on December 5, 2002, ALVAREZ was convicted of first-degree murder in violation of California Penal Code § 187(a), which defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought." He was also convicted of the enhancement of personally and intentionally discharging a

firearm and proximately causing death to a person other than an accomplice in violation of California Penal Code § 12022.53(d). ALVAREZ was sentenced to a total of 50 years to life.

22. According to his certified conviction record, in convicting ALVAREZ after trial, the jury found that ALVAREZ intentionally killed the victim while ALVAREZ was an active participant in a criminal street gang and the murder was carried out to further the activities of the criminal street gang pursuant to California Penal Code § 190.2(a)(22). The jury further found that ALVAREZ personally and intentionally discharged a handgun which proximately caused great bodily injury and death to the victim.

## VII. TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES

23. From my training, my personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct racketeering investigations, I am aware of the following:

a. Gang members who engage in racketeering offenses like murder, assaults, and the operation of illegal gambling operations often store or maintain items associated with their gang affiliation in their homes and on digital devices, such as a cellphone. This can include photographs or images of graffiti associated with their gang, photographs of other objects displaying allegiance to their gang, including posters, drawings, hats or other apparel bearing gang signs and symbols, rosters, monikers, telephone numbers, ledgers, and sometimes detailed notes about discipline, debts owed, gang members who

are not in good standing, rent collection, and rent payments. Such information can be stored in digital format as well.

b. Correspondence between gang members discussing gang politics, including discipline, often occurs over phone calls, e-mails, text messages, and social media messages to and from smartphones, laptops, or other digital devices. Gang members also keep mementos of their gang paraphernalia, including digital photographs or recordings of themselves on their digital devices, since they are a source of pride. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

## VIII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24. As used herein, the term "digital device" includes the SUBJECT DEVICES.

25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To

unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ALVAREZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of ALVAREZ's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

28. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

29. For all the reasons described above, there is probable cause to believe that ALVAREZ violated 18 U.S.C. § 931(a) (possession of body armor by violent felon).

30. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT DEVICES, as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 27th day of May, 2026.

Patricia Donahue

HON. PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE